```
           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SCOTTSDALE INS. CO.,              :   CIVIL ACTION
                                  :   NO. 17-0350
          Plaintiff,              :
                                  :
     v.                           :
                                  :
KINSALE INS. CO.,                 :
                                  :
          Defendant.              :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                             May 26, 2017

This action arises from a claim by Plaintiff Scottsdale Insurance Company ("Scottsdale") that Defendant Kinsale Insurance Company ("Kinsale") is liable under an insurance policy issued by Defendant Kinsale to AJA Skies the Limit, Inc. ("AJA Skies the Limit") for the costs of Plaintiff Scottsdale's defense and indemnification of its own insured, P. Tamburri Steel, LLC ("Tamburri"), with respect to an underlying action based on a written subcontract (the "Subcontract") between Tamburri and AJA Skies the Limit. Kinsale removed the case to federal court on the basis of diversity, and now moves to compel arbitration. For the reasons that follow, the Court will grant the motion to compel arbitration and dismiss the case.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Scottsdale's insured is Tamburri. Kinsale's insured is AJA Skies the Limit. See Notice of Removal ¶ 1, ECF No. 1. The Subcontract at issue concerns steel erection services that were to be performed at a certain Pennsylvania construction project. Compl. ¶ 18, ECF No. 1. Under the Subcontract, a company called AJA Services, Inc. ("AJA Services") agreed to indemnify and hold harmless Tamburri with respect to all personal injury claims arising out of or resulting from the performance of the steel erection work performed on the project. Id. ¶ 20.

Two separate actions filed in the Court of Common Pleas of Philadelphia County are relevant to the instant lawsuit. The first of these is Buckman v. Gwynedd Mercy University, et al., No. 2342 (Pa. Ct. Com. Pl. filed Feb. 14, 2014) (the "Buckman Action"). See id. ¶ 2. This was a personal injury action in which a plaintiff steel worker claimed to have slipped and fallen on wet steel decking at a construction site. See id. ¶ 14. On January 22, 2015, the Court of Common Pleas entered a default judgment in favor of the plaintiffs[1] and against AJA Skies the Limit and AJA Services for failure to answer the complaint within the required time limit. See id. ¶ 21. Nearly a year later, on January 12, 2016, the case settled

---

[1] The wife of the injured steel worker was also a plaintiff in this action.

for a total amount of $1,209,717.69. See id. ¶ 22. On April 28, 2016, the Court of Common Pleas held a bench trial and subsequently entered a finding of liability and order of judgment against AJA Skies the Limit and in favor of Tamburri in the amount of $1,154,491, representing the reasonable cost of settlement and the reasonable cost of attorneys' fees and expenses incurred in defending against this action. Id. ¶¶ 23-25. Scottsdale incurred and paid the above defense and indemnity amounts on behalf of Tamburri. Id. ¶ 26.

The second action relevant to the instant case is P. Tamburri Steel, LLC v. AJA Skies the Limit, Inc., et al., No. 0855, (Pa. Ct. Com. Pl. filed Jan. 25, 2017) (the "Tamburri Action"). See id. ¶ 2. In the Tamburri Action, Tamburri--the defendant contractor in the Buckman Action--sought declaratory relief to reform the Subcontract that was at issue in the Buckman Action. Id. ¶ 28. On January 14, 2015, the Court of Common Pleas entered default judgment against AJA Skies the Limit. Id. ¶ 29. On February 23, 2015, the Court of Common Pleas signed an order granting Tamburri's motion for entry of judgment and order on default, thereby equitably reforming the Subcontract to name "AJA Skies the Limit, Inc."--rather than the originally named "AJA Services, Inc.,"--as the steel erector

with whom Tamburri subcontracted with respect to the construction project at issue in the Buckman Action.[2] Id. ¶ 32.

The following diagram illustrates the relationships between the various actors implicated in this case:



In the instant case here in federal court, Scottsdale seeks, in both its individual capacity and as a subrogee of Tamburri, to recover from Kinsale the monies spent and incurred for its defense and indemnity of Tamburri in the Buckman Action. See Notice of Removal ¶ 15 (citing Compl. ¶ 1). Kinsale "has consistently denied coverage under [its] Policy with respect to the claims alleged in the underlying Philadelphia county actions, claiming that AJA Skies the Limit, Inc. was the only named insured under Kinsale's Policy." Compl. ¶ 38.

---

[2] The Court does not express any opinion as to the reformation by the Court of Common Pleas. Throughout this memorandum and for purposes of this decision, the Court refers to the entity insured by Kinsale as "AJA Skies the Limit."

4

On October 20, 2014, Scottsdale sent Kinsale a letter tendering the underlying claims against Tamburri to Kinsale and requesting that Kinsale undertake the defense, indemnity, and handling of the claims against Tamburri in the Buckman Action pursuant to the terms of the Subcontract. Id. ¶ 42. Scottsdale cautioned in the letter that Kinsale's "failure, refusal[,] or neglect to undertake the defense and to indemnify Tamburri would result in Kinsale being bound by the result of a trial or settlement of the underlying Buckman Action." Id. ¶ 43.

Kinsale denied coverage for Scottsdale's tender on behalf of Tamburri, asserting that Tamburri's Subcontract was not with Kinsale's insured, AJA Skies the Limit, but instead was with AJA Services, Inc., which was not an insured or additional insured under Kinsale's policy. Id. ¶ 44.

Following the issuance of the February 23, 2015, order reforming the Subcontract to name "AJA Skies the Limit" instead of "AJA Services," Scottsdale retendered the defense of Tamburri to Kinsale on March 6, 2015. Id. ¶ 45. Kinsale again denied coverage, and this cycle happened twice more in 2015. See id. ¶¶ 47-49. In December 2015, Kinsale characterized the February 23, 2015, order as a "sham [o]rder" constituting a "fiction" created by Scottsdale. Id. ¶ 49. Kinsale again denied the existence of any written contract between Tamburri and AJA Skies

5

the Limit sufficient to trigger coverage under Kinsale's policy. See id.

Based on the foregoing facts, Scottsdale now brings six distinct causes of action and requests for relief against Kinsale, all of which stem from Scottsdale's expenses incurred in defending AJA Skies the Limit in the Buckman Action. These include unjust enrichment, quantum meruit, equitable request for reimbursement of defense costs, equitable contribution and indemnification, equitable subrogration, and reformation of the Kinsale Insurance Policy. Id. ¶¶ 50-93. Scottsdale demands total compensation in excess of $75,000. Notice of Removal ¶ 16.

On January 25, 2017, Kinsale removed the instant action to this Court on the basis of diversity.[3] ECF No. 1. On February 6, 2017, Kinsale filed a motion to dismiss and compel arbitration. ECF No. 5. Scottsdale responded in opposition to this motion on February 21, 2017. ECF No. 8. On March 7, 2017, the Court held an initial pretrial conference and hearing on the motion to dismiss and compel arbitration. See ECF Nos. 7, 11.

---

[3] Scottsdale is an Ohio corporation having its principal place of business in Scottsdale, Arizona. Notice of Removal ¶ 7. Kinsale is an Arkansas corporation having its principal place of business in Richmond, Virginia. Id. ¶ 8.

## II. MOTION TO DISMISS AND COMPEL ARBITRATION

### A. Legal Standard

The arbitration agreement in Kinsale's policy is governed by the Federal Arbitration Act ("FAA"), which provides in relevant part as follows:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . , shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Third Circuit has held that "when it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'" Guidotti v. Legal Helpers Debt Resolution, LLC, 716 F.3d 764, 776 (3d Cir. 2013) (quoting Somerset Consulting, LLC v. United Capital Lenders, LLC, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).

"Before compelling a party to arbitrate pursuant to the FAA, a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." Century Indem. Co. v. Certain Underwriters at Lloyd's, 584 F.3d 513, 523 (3d Cir. 2009). "Arbitration is strictly a matter of contract," and, accordingly, "[i]f a party

has not agreed to arbitrate, the courts have no authority to mandate that he do so." Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 444 (3d Cir. 1999).

"[A] non-signatory cannot be bound to arbitrate unless it is bound 'under traditional principles of contract and agency law' to be akin to a signatory of the underlying agreement." E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 194 (3d Cir. 2001) (quoting Bel-Ray, 181 F.3d at 444). One of these "traditional principles"--and the one implicated in the instant case--is equitable estoppel:

> [T]here are two theories of equitable estoppel in this context. First, courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement. Second, courts have bound a signatory to arbitrate with a non-signatory "at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations."

Id. at 199 (alteration in original) (quoting Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995)) (internal quotation marks and citations omitted).

"Under the first theory, courts prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause,

that it finds distasteful."[4] Id. at 200; see also Invista S.A.R.L. v. Rhodia, S.A., 625 F.3d 75, 85 (3d Cir. 2010) (equitable estoppel "prevents a non-signatory from 'cherry-picking' the provisions of a contract that it will benefit from and ignoring other provisions that don't benefit it or that it would prefer not to be governed by (such as an arbitration clause)"). Critical to this inquiry is an analysis of whether the non-signatory's claim "implicates, at least in part, the very [a]greement [the non-signatory] repudiates to avoid arbitration." E.I. DuPont, 269 F.3d at 201; see also id. at 200 (examining whether, "at bottom, [the non-signatory's] claims against [the defendant] arise, at least in part, from the underlying [a]greement").

The issue in this case is whether Scottsdale, a non-signatory of the agreement between Kinsale and AJA Skies the Limit, can be compelled to arbitrate its claims against Kinsale under the arbitration provision contained in the agreement between Kinsale and AJA Skies the Limit.

---

[4] The second theory involves "claims about parent companies who have not signed agreements containing arbitration clauses entered into by related entities." Friedman v. Yula, 679 F. Supp. 2d 617, 628 (E.D. Pa. 2010) (Robreno, J.). This theory is not applicable here.

9

B.  Analysis

The arbitration provision in Kinsale's policy provides in relevant part as follows:

> All disputes over coverage or any rights afforded under this policy, including whether an entity or person is a named insured, an insured, an additional insured, or entitled to coverage under the Supplementary Payments provisions of this policy or the effect of any applicable statutes or common law upon the contractual obligations owed, shall be submitted to binding arbitration, which shall be the sole and exclusive means to resolve the dispute. Either party may initiate the binding arbitration.

O'Neill Decl. Ex. A, at Endorsement CAS2007 0110, p. 3, ECF No. 5-2.

The parties here do not dispute either the facts of this case or the applicable law. Specifically, they do not dispute that Kinsale's policy contains a valid and enforceable binding arbitration clause, nor do they dispute that Scottsdale was not a signatory to Kinsale's policy. Instead, they dispute only whether Scottsdale "knowingly exploit[ed]" Kinsale's policy, "despite having never signed the agreement." E.I. DuPont, 269 F.3d at 199.

Kinsale argues that Scottsdale's claims "are entirely dependent on Kinsale's obligation (if any) to provide coverage under the Kinsale Policy for the underlying claim." Mot. Dismiss Mem. at 12, ECF No. 5-1. Kinsale frames broadly both the arbitration clause itself and Scottsdale's claims, arguing that "[t]he Kinsale Policy contains a broad, unconditional,

10

unqualified arbitration provision" under the "plain terms" of which "the questions of whether Kinsale has any coverage obligations under the Kinsale Policy, and the possible scope of those obligations (if any), are subject to binding arbitration." Id. at 1.

For its part, Scottsdale responds that it is "asserting claims that are based upon the relative relationship that exists between two liability insurers that insured a common risk or event, as opposed to seeking to obtain a direct benefit from the contractual duties embodied in Kinsale's policy." Pl.'s Resp. Mem. at 8, ECF No. 8-2. Scottsdale argues that it would be unfair to invoke equitable estoppel in this case because "Scottsdale has alleged equitable claims based upon principles of contribution and indemnity, which do not flow directly from any contractual benefits afforded under Kinsale's policy." Id. at 12.

For legal support, Kinsale relies on several cases that it finds analogous to the instant case. The first of these is Sanford v. Bracewell & Giuliani, LLP, 618 F. App'x 114, 116-18 (3d Cir. 2015) (non-precedential), a case in which a husband and wife sought legal counsel but only the husband signed the engagement agreement with the law firm the couple used. The Third Circuit found that, although the wife was not a signatory to the engagement agreement, she was "nevertheless bound by the

arbitration clause under equitable estoppel principles" because she had "asserted a breach of contract claim and identified the written [e]ngagement [a]greement as the contract allegedly breached." Id. at 118. The Third Circuit described this "attempt to 'claim the benefit of the contract and simultaneously avoid its burdens'" as "precisely the situation the doctrine of equitable estoppel seeks to prevent." Id. (quoting E.I. Dupont, 269 F.3d at 200).

Kinsale also cites a case that this Court decided in 2010 involving a plaintiff father who alleged that, "as a result of certain misrepresentations and oral agreements made by [the defendants]," he transferred his interest in a vending machine business to his son. Friedman v. Yula, 679 F. Supp. 2d 617, 628 (E.D. Pa. 2010) (Robreno, J.). Despite the plaintiff having never signed the agreement at issue, this Court found that, "having embraced the written agreement . . . to prove his claims and his damages, [the plaintiff] cannot now walk away from the arbitration clauses in the [relevant agreements]," and accordingly compelled arbitration. Id.

Scottsdale argues that the cases Kinsale cites are inapposite because the plaintiffs in those cases sought "direct benefits" under the contracts that were at issue, whereas here, "Scottsdale never entered into any direct contractual relationship with Kinsale, nor has Scottsdale pursued a direct

breach of contract claim against Kinsale in this case." Pl.'s Resp. Mem. at 9. Scottsdale instead points to Danaher Corp. v. Travelers Indem. Co., No. 10-121, 2014 WL 7008938, at *8 (S.D.N.Y. Dec. 12, 2014), in which the court found that Travelers' Insurance Company ("Travelers") should not be compelled to arbitrate under insurance contracts to which it was not a party:

> Industria and Trygg-Hansa contend that Travelers is bound by the arbitration clauses in their respective insurance policies covering Atlas Copco, although Travelers is not a party to those agreements. The Court disagrees. Travelers' cause of action against these insurers sounds in contribution, under the "well-settled principle" that permits "one party jointly liable on an obligation [that] pays more than its pro rata share [to] . . . compel the co-obligors to contribute their share of the amount paid." Md. Cas. Co. v. W.R. Grace & Co., 218 F.3d 204, 210 (2d Cir. 2000). Travelers, in seeking contribution, did not knowingly accept a direct benefit of Trygg-Hansa's and Industria's insurance contracts with Atlas Copco. The benefit of these insurance policies ran to Atlas Copco, the insured party. Instead, the interest that Travelers seeks is an "indirect" one, because rather than "flowing directly from the agreement," it "exploits the contractual relation" between the insurers and Atlas Copco that may require Trygg-Hansa and Industria to defend or indemnify Atlas Copco against certain claims--which, in turn, may give rise to a contribution claim by Travelers.

Id. (footnotes and internal citations omitted). Scottsdale argues that this is analogous to the present case because "[t]he gravamen of Scottsdale's claims concern the equitable right to recover amounts that should have been paid by Kinsale." Pl.'s Resp. Mem. at 12; see also id. at 15 ("Scottsdale's equitable

13

contribution and indemnity claims are not based directly on the terms of the Kinsale policy, but arise out of the equitable and common law rights and obligations that exist between co-insurers that cover a common event or risk.").

Finally, Scottsdale notes that, when Kinsale filed a Demand for Arbitration and Statement of Claim with the American Arbitration Association ("AAA") in April 2016 to obtain a declaratory judgment,[5] Kinsale identified Scottsdale only as an "other interested party" and "chose not to seek any declaratory, or other relief, against Scottsdale in the AAA Statement of Claim." Id. at 18-19. Scottsdale argues that "Kinsale's decision not to seek any direct relief against Scottsdale in the AAA provides highly probative evidence that Kinsale never considered Scottsdale's claims to fall within the plain meaning of the Kinsale arbitration provision." Id. at 19.

The Court finds that Scottsdale's claims depend almost entirely on the scope of Kinsale's policy and the coverage Kinsale owes Tamburri under that policy, if any. Specifically, Scottsdale brings claims for unjust enrichment, quantum meruit, and reformation of Kinsale's policy to include AJA Services, Inc., as a named insured. See Compl. ¶¶ 50-93. These claims

---

[5] In that arbitration action, Kinsale specifically sought "a declaratory judgment that there is no coverage for Tamburri as an additional insured" under the policy that Kinsale had issued to AJA Skies the Limit. See Statement of Claim, Apollo Decl., Ex. A, ¶ 7, ECF No. 8-5.

clearly "arise, at least in part, from the [agreement at issue]." E.I. DuPont, 269 F.3d at 200. Additionally, Scottsdale brings claims for indemnification and equitable subrogation, meaning that Scottsdale seeks essentially to step into the shoes of Tamburri and exercise the rights and remedies--specifically, the rights to defense and indemnity by AJA Skies the Limit's insurance company, Kinsale--that are available to Tamburri under the Subcontract. The Kinsale policy is what provides Tamburri (and Scottsdale, as subrogee) the defense and indemnity that Scottsdale ultimately seeks. In other words, without the Kinsale policy, there is no defense or indemnity available to Tamburri (or Scottsdale).

It is true that there is no allegation in this case that Scottsdale "embraced" Kinsale's policy "during the lifetime of the [agreement]," nor is there evidence that Scottsdale received "any direct benefit" from that agreement. Id. The absence of either or both of these factors, however, does not fatally undermine Kinsale's argument that Scottsdale's claims "are entirely dependent on Kinsale's obligation (if any) to provide coverage under the Kinsale Policy for the underlying claim." Mot. Dismiss Mem. at 12.

E.I. DuPont is not to the contrary. There, the Third Circuit noted expressly that it would not invoke equitable estoppel regarding the arbitration provision at issue in that

15

case not because the relevant agreement was not "embraced . . . during [its] lifetime" or because no "direct benefit" flowed from the agreement to the party opposing arbitration. E.I. Dupont, 269 F.3d at 200-01. Instead, what "save[d] the day" and prevented the court from compelling arbitration was the fact that the case involved a "separate oral agreement" that lay "at the core of [the] case" but nonetheless remained "wholly apart" from the question of whether there was any breach of the written agreement containing the arbitration clause. Id. at 201. In other words, the plaintiff's claims in that case were dependent, unlike here, not upon the agreement containing the arbitration provision, but instead upon a separate oral agreement subject to no arbitration clause. The instant case does not involve any separate agreement that shifts the basis of Plaintiff's claims away from the written agreement that contains a broad and binding arbitration provision.

Nor is Danaher is helpful here because Danaher involved a contribution question, see Danaher, 2014 WL 7008938 at *8, whereas the instant case concerns equitable subogration. Subrogation is an equitable doctrine "intended to place the ultimate burden of a debt upon the party primarily responsible for the loss." 14A Summ. Pa. Jur. 2d Insurance § 24:1 (2d ed.) In contrast, "the aim of equitable contribution is to apportion a loss between two or more insurers who cover the same risk."

16

Id. Unlike in Danaher, the two insurance companies here did not insure the same party. Scottsdale is not seeking contribution from Kinsale for any risk that the two companies both covered, but is instead seeking to place the burden of the loss--i.e., the monies spent and incurred for the defense and indemnity of Tamburri in the Buckman Action--against the party primarily responsible for that loss--i.e., AJA Skies the Limit (insured by Kinsale).

Under the circumstances of this case, given that Scottsdale's claims are entirely dependent on Kinsale's obligation to provide insurance coverage under the Kinsale policy, Scottsdale is equitably estopped from objecting to the arbitration clause in the Kinsale policy.

## III. CONCLUSION

For the foregoing reasons, the Court will grant the motion to compel arbitration and dismiss the case. An appropriate order follows.